Good morning, Your Honor. May I please record? My name is Arthur Liu. I'm for the petitioner. How do you pronounce the name? Arthur Liu, L-I-U. No, I mean the petitioner's name. Oh, the petitioner's name is Zhong You Zhou. Zhou. Zhou, yes. All right, please proceed. Thank you, Your Honor. Well, the facts of the case is very straightforward and simple and undisputed. Petitioner Mr. Zhou is a labor activist. He fought against the corrupt communist government official in his company, which is a state-owned company. And in 2008, the company laid off 30 workers. And most of them have been working for the company for about 20 to 30 years with barely any compensation, what they call the severance compensation. Mr. Zhou organized the workers and tried to negotiate with the state-owned company about increasing their severance compensation, because once they were severed from this company, they have no other employment opportunities and the rest of their lives will be in dark condition. And Mr. Zhou organized them and negotiated with the company, but they refused. Mr. Zhou took the matter a level higher to the municipal government of Mianyang in Sichuan Province. Meaning the mayor's office? Yes. And when they demonstrated in front of the government building, they were arrested by the police. Could it have been that they were arrested because they were they didn't follow the proper procedures to protest, not because they were protesting, but because they were not authorized to be at the location where they protested? Well, Your Honor, that's a fair question for us here in the United States. But in China, the situation is that no government official would issue any kind of permits for demonstrations organized by the workers. The record clearly reflects that the workers in China have no freedom of association. They have no bargaining power. They cannot air their dissident opinions against any kind of government regulations. Let's assume there's a procedure to obtain the permits to demonstrate. They would be denied. The fact, I think the record shows that they tried to get the permit, but they did not get it. Well, I thought that Mr. Zhao said he did not know whether there were laws or permits necessary to congregate in front of government buildings. Well, you may be right, Your Honor. Like I said, even if there's a procedure for that, people in China all know that that procedure was there just for show. It's not for reality. Nobody would be able to get a permit to demonstrate against the Chinese government. You know, you're right. By our standards, the Chinese government doesn't treat people very well. But the I.J. said that there are two things that are possibly going on here. One could be that police were after him because of his political position. The other could be that the police were after him simply because he and his friends barged into the mayor's office unannounced. And then, I'll quote this from the I.J.'s opinion, he, meaning your client, indicated that he did not tell the mayor's assistant what the purpose of their trip was, but only that it was an important topic. So the I.J. says your client and this crowd burst into the mayor's office unannounced, refused to say why they were there, demanded a meeting with the mayor, were told that the mayor was busy, they wouldn't leave. So then the police came in, knowing nothing about what this was, except there were a bunch of people in the mayor's office who were causing trouble. So the police then took them out. Now, the I.J. says they were persecuted, but he can't find a nexus. What is it that compels all reasonable people to say that what the police did at that time was on account of a political opinion? If he had said we're here politically to protest, that's one thing, but he wouldn't say. Is this right? Well, Your Honor, you're partly right, actually. But just one very important detail. Mr. Zhou's negotiation with the company, the state-owned company, has been going on for quite some time. Did the police know that? No. The police knows that because the police actually took the security guards of the state-owned company to the scene of demonstration and arrested them. If the police did not know anything about why Mr. Zhou was there, why this group of workers were there, they would not have called the security guards from the state-owned company to be at the scene. Only the leaders were arrested. The rest of the people were dispersed. And from that very important detail, we can tell that the police actually knows why they were there, and the mayor's office knew why they were there protesting. This issue has been going on for a long time. It's not like Mr. Zhou and his people just suddenly appeared before the mayor's office. And the fact of the matter is, even if you request a meeting with the mayor, is the mayor going to meet with you and talk about the corruption in the state-owned company and how they treated the workers? No, Your Honor. That's not the reality in China. Now, where in the record does it establish the facts that you just said, that the police engaged in activity that demonstrates, beyond doubt, that they knew that this whole thing was because of this political battle that had been going on forever? Where is that in the record? Well, I don't have – I apologize. I don't have the exact citation to the record for that fact. But I clearly remember that the record shows that the police, along with the security guards – This is in his testimony, then? Yes. Yes, Your Honor.  I can, Your Honor. You have his wife who testified, correct? And she testified that the Chinese government told her that they believe that her husband, quote, despises the chief of the mine and the government officials, and that he has, quote, defamed the leaders of the city. That was evidence that the IJ completely ignored and did not address at all. That's correct, Your Honor. And do you think that that really makes the difference in this case as to whether or not you have acts here against the government, against the Chinese officials? I mean, is that really where you draw the line here? Well, the evidence you just quoted, Your Honor, is – that's correct. And I think that that also shows that the Chinese government really knows what's going on and they knew what Mr. Zhou and his people were up to. Are you aware of the circuit's decision last year in July of 2011 in the case of Hugh v. Holder? It's not cited in your brief, but it seems to me that that case sets forth the standard that you have to show in order to establish political opinion that the police accused this gentleman of acting against the government and against the Communist Party. That's what Hugh seems to stand for. Do you have that evidence in this particular case? Yes, Your Honor. First of all, Mr. Zhou was up against this corrupt Chinese Communist secretary, party secretary. And second, the evidence shows that Mr. Zhou was up against a state-owned company. Third? His letter accused the leaders of the mine and other government officials, apparently, in addition to me, right? Yes, Your Honor. I think the nexus was clearly established in this case. You know, the IG found that Mr. Zhou was persecuted. There was no doubt that he was beaten up. He was actually tortured during that one-night detention. And he was forced to sign a confession not to engage in such activities anymore. If the police didn't know why he was there, you know, what the purpose was, they would not have forced him to sign such a confession. Their allegation against him was that he was disturbing the peace. He was gathering people there illegally. But like I said, any kind of gathering in China is illegal in the eyes of the Chinese Communist government. If you fight against one government official, it is against the whole system. That's a dire reality in China. For example, most recently there's this young man demanding Hu Jintao, the president of China, to disclose his personal assets, and he was arrested. All right, counsel, thank you. We'll give you one minute for rebuttal. We'll hear from the government. You're familiar with the Hu case? It's not cited in your brief either. No, Your Honor. I'm actually not familiar with the Hu case. It seems to set out the standard. First, the RJ in this case seemed to say that Zhou's personal motivation was dispositive in respect to his whistleblower claim. As I read Hu, the individual's motivations are not relevant. The proper focus is on whether the Chinese government believed that Zhou has criticized the government by accusing it of corruption. Before you answer, counsel, will you introduce yourself for the record? Of course. May it please the Court, my name is Nicholas Harling. I represent the Respondent, the Attorney General of the United States. Your Honor, what it sounds like the Hu case is actually outlining is very similar to the holding in Elias Zacharias, the United States Supreme Court case, which says when you're dealing with an instance of what might be an imputed political opinion, we look at what the persecutor believes the persecutee's opinion might be. Well, did the IJ ignore evidence that Zhou's letter also contained allegations against the leaders of the mine and other government officials in addition to Meng? I mean, he doesn't make any reference to that. He seems to pin his case upon his interaction with Meng and disregards everything else. No, Your Honor. Just because the IJ doesn't mention that fact, and similarly, earlier when you stated that the IJ's decision doesn't reference the wife's deposition, the immigration judge is not required to write an exegesis on all the evidence that he considers. Therefore, just because it's not in the immigration judge's decision does not mean that the immigration did not consider that. But there's no adverse credibility determination here, is there? That's correct, Your Honor, but — You know, the IJ didn't say anything about Zhou's testimony that he despised the chief of the mine and the government officials and defamed the leaders of the city. Isn't that similar to what we have in the Hu case, which you haven't cited? Well, Your Honor, just because there's no adverse credibility determination, that just means that the immigration judge doesn't believe that any of that — He can do whatever he wants and ignore any other relevant evidence, right? Your Honor, there's no compelling evidence that the immigration judge ignored any evidence in this case. He doesn't say anything about, you know, Zhou's wife's statement. He doesn't say anything about the other part of Zhou's letter. And he seems to base his decision upon Zhou's personal motivation, which under Hu is not, you know, necessarily the relevant standard. Well, that's true, Your Honor, but again, just because it's not mentioned in the immigration judge's decision doesn't mean that it didn't form part of the basis of the decision. In this case, there's no compelling evidence that Zhou's whistleblowing was a central reason for his mistreatment because of the simple fact that at the time of his arrest, the police had no idea that he was in the mayor's office attempting to expose corruption. But opposing counsel says that the police knew exactly why he was there. Your Honor, I'm not aware of anywhere in the record that states that the police know exactly why he's there. The record is clear that when asked what he was doing there, he refused to tell anyone what his business was. And when asked to leave, he refused to do so. And in that regard, it's clear that the police viewed him as a lawbreaker. And for that reason, there was a legitimate prosecutorial purpose for their arrest of him, which rebuts the Court's presumption that harassment by a government is inherently political. In this case, that wasn't true. There is also substantial evidence to support the determination that Mr. Zhou's whistleblowing was not political in nature. In line with this Court's decision in Grava, in this case, Mr. Zhou was attempting to expose individual corruption and not widespread institutional corruption. But that's different than his letter that specifically talks about, you know, complaining that the leaders of the mine and government officials, not just man. I don't understand that. But, Your Honor, in his testimony before the immigration judge, he only speaks to one individual, and that is the leader of the mine. So he's really talking about one person in this sense and not widespread institutional corruption. What also supports the board's decision that Mr. Zhou was not a political whistleblower is the fact that he waited 10 years to expose this corruption, and he only did so when he thought he could use this as leverage to get his job back. He has never testified that he was attempting to stop the corruption. He just wanted to use it for his own personal benefit. And there is also no evidence in the record that any of the treatment that he experienced rose to the level of torture, as he suggested. And you heard counsel make the argument there was an agreement between the security staff and the police in the blue brief. I'm sure you've read this. The argument is made that, on the contrary, the evidence clearly shows that the government knows or knew exactly why Zhou and the laid-off workers were there. That means in the mayor's office. Because the record shows Zhou and the other representatives have been trying to negotiate with a state-owned mine company without success. The record further shows that security staff from Zhou's work unit came with six police, Administrative Record 123. It's a clear inference that Zhou's work unit had informed the police about the reason why they were in the office. Is that correct as a matter of fact from the record? I don't believe it is, Your Honor. And I don't believe it is because there's also testimony at the hearing that Mr. Zhou stated that when he was being interrogated by the police, they made no mention of corruption. They just simply were interested in the fact that he was there involved in an assembly without a permit. And that's why they made him sign the confession that he would not be involved in a similar assembly again. Well, I'll have to go look at AR 123, then, because this allegation is that the security staff were with the police who made the arrest. You have 123 there? I do, Your Honor. It's an electronic record, so I don't have it. What does 123 say about security staff accompanying the police to the mayor's office? Just give me one second. Let me skim it. He talks about when he was arrested, they took three representatives. I assume he means the three that were in the mayor's office. The other people outside, they were driven away. He was taken to the police station. He was kept in a small room. What happened next? The police left me handcuffed for hours. That's it. There's no mention of security staff. Excuse me. Let me see. I might have missed it at the top. The record further shows that security staff from Zhou's work unit came with six police AR 123. That is true. I missed that when I was skimming. About one hour later, that is time which I could estimate. I could guess. I could estimate. And at that time, the security staff of our work unit came together with six police. So there was a confluence between the security staff and the police. So doesn't that support the idea that it was more than the police just showing up to pick up some people who were disrupting the mayor? Well, Your Honor, even on this record, there's no evidence, let alone compelling evidence, that the security staff from the work unit were in any ways there because he was involved in exposing corruption. You mean they just had to show up because they were on their way to the ball game and they stopped off at the mayor's office? I mean, I think it's a clear inference that they were there with the police because of what was going on. That means the police knew who this guy was, what was happening, that this was a dispute. But I'm not sure that's compelling evidence. They were there because he was attempting to expose corruption. Why were they there? Why did they show up with the police? What's the other inference? That it's quite embarrassing for the mine to have a disruption. China doesn't like disruptions. So that's clearly another alternative inference of why they were there. So the mine, it puts the mine in bad public light to have the workers going to the mayor's office. So then the I.J. says these people get tortured. The I.J. doesn't say. There is no torture finding. Persecution. The I.J. does make a persecution finding. However, the Board did not adopt that persecution finding. The Board only adopted the conclusion that there was no nexus between the harm that was experienced and a statutorily protected basis. And for that reason, if this Court ---- And the past persecution determination by the I.J. simply says the DHS does not challenge those determinations. So there was no challenge to the past persecution determination. That's correct, Your Honor.  The Board did not make the determination and agree with the immigration judge on the persecution determination. For that reason, if the Court determines that Mr. Zhao has established a nexus, the proper course of action is to remand the case back to the Board to make the prosecution determination. If there are no further questions, I would request that the Government ---- excuse me. The Government would request that the Court deny the petition for review. All right. Thank you, counsel. We'll give you one minute for rebuttal, Mr. Liu. Thank you, Your Honor. First of all, the whistleblower statute or that argument, we're actually not making too much of that argument at all. What we are here for is that Mr. Zhao organized the workers, negotiated with the company and demonstrated before the mayor, tried to seek some relief there, and he was arrested and he was beaten up. And according to the IJA, he was persecuted in the past. And our position is also supported by the United States Department of State's 2008 Annual Human Rights Report. In that report, there was numerous quotes of similar situations that Mr. Zhao was in, and those were all labored political prisoners. Mr. Zhao and his workers were clearly there to air disapproval of the Government's actions. Again, the Chinese Government does not like it. The record citation that you couldn't come up with before, I assume that's AR-123, that was read to us about the security people being there with the police. Yes, that's correct. What about counsel's suggestion that the persecution finding by the IJA just is sort of hanging because they adopted just the no nexus thing and not persecution, and that even if we agree with you, we have to remand to see what the Board says about past persecution? Well, Your Honor, I think from what you just read, I think the Board of Immigration Appeals actually affirmed that determination of the immigration judge, that there was persecution just, and then I think from what you just read, I heard it, the Board affirmed that determination. I don't think that's fairly read that way, because it said it referenced nonetheless concluded, and it says we adopt and affirm that conclusion regarding the nexus. It doesn't say the finding of persecution. Well, the past persecution. Wouldn't DHS be barred from challenging it this time if they didn't challenge it before? That's what I was going to say, Your Honor. I took the words right out of your mouth. Well, but I don't know about that, because we're reviewing the BIA decision, not the IJA determination. Well, the Board's decision pretty much adopts the IJA's decision. Well, I don't know if they adopted the persecution finding, but I guess we'll figure that out one way or the other. Thank you so much. Thank you to both counsel. Are there any other questions? No, thank you. All right. The case just argued is submitted for decision by the Court. The next case on calendar for argument is Wang v. Holder. Oh. Is that your colleague? Do you know where he is? He is, Your Honor. No, I do not know where he is. I have not seen him this morning. All right. And we'll submit this case on the briefs.   This case is on the court of appeals. The next case on calendar for argument is Genesis Insurance Company v. Magma Design Automation. Clerk, please note that Wang v. Holder is submitted on the briefs. Good morning, counsel. Good morning, Your Honors. My name is Michael Johnson. I'm here representing the Appellant National Union. This is an insurance coverage dispute. It involves an excess insurance policy that was issued by my client, National Union. It's a $5 million excess policy over a $10 million primary policy that had been issued by Executive Risk. And before I forget, I would like to save approximately five minutes for rebuttal. You're representing National Union? Correct. So, and our policy was in effect from December 15, 2004, until March of 2006. The dispute concerns whether there is coverage under the National Union excess policy.
judges: Block, Trott, Rawlinson